LEONARD WASSERMAN, Indiv. and on Behalf of the Shareholders of Autohaus on Edens, Inc., Plaintiff-Appellant, v. AUTOHAUS ON EDENS, INC., *et al.*, Defendants-Appellees.

First District (3rd Division)   Nos. 1—88—1471, 1—88—1504 cons.

Opinion filed August 15, 1990.

Laser, Schostok, Kolman & Frank, of Chicago (Milton J. Kolman, Bruce M. Friedman, and Melbourne A. Noel, Jr., of counsel), for appellant.

Sidney Z. Karasik, of Chicago (Mary Ellen Dienes, of counsel), for appellees.

JUSTICE RIZZI delivered the opinion of the court:

Leonard Wasserman (Wasserman), plaintiff-appellant, is appealing orders finding that (1) he did not become and is not a stockholder of Autohaus On Edens, Inc. (Autohaus), and (2) awarding him $36,043.84, the return of his investment plus statutory interest. On appeal, Wasserman argues that (1) the trial court's finding that he is not a shareholder is contrary to the manifest weight of the evidence and (2) the trial court erroneously shifted to him the burden of proving the absence of a condition precedent to the Autohaus shareholder agreement. Alternatively, Wasserman argues that the judgment cannot stand because Autohaus, Joseph Rosengarden and Ralph Rosengarden (defendants), are precluded by the doctrines of waiver and estoppel from asserting the purported unsatisfied condition precedent as a bar to his stock ownership.

Wasserman's second amended complaint sought a permanent injunction, damages, reinstatement of employment, dissolution and other relief, based upon a breach of an oral shareholder agreement. The parties and the court stipulated to a bifurcated trial, beginning with the threshold question of whether Wasserman was a shareholder of Autohaus.

In 1971, Wasserman was general sales manager of Hudek Oldsmobile. Joseph Rosengarden (Joseph) and Ralph Rosengarden (Ralph) owned and operated Leslie Oldsmobile in Glen Ellyn, Illinois. Wasserman testified that Joseph asked him if he would like to be a partner in the acquisition of a Pontiac dealership in Highland Park. According to Wasserman, Joseph proposed that Wasserman would invest $20,000

and receive a 20% stock interest and serve as the general manager. All salaries, bonuses and other benefits derived from the operation of the business would be equally divided among Wasserman, Joseph and Ralph. They each would be members of the board of directors. After the efforts to acquire the Pontiac dealership failed, the parties agreed to undertake the purchase of Autohaus, an import car business.

Wasserman testified that Joseph proposed that Wasserman participate in the acquisition of the Autohaus dealership on the same terms that had been discussed with the other dealership, that is (1) Wasserman would receive a 20% stock interest in return for a $20,000 investment; (2) Wasserman, Joseph and Ralph would each receive one-third of all profits and benefits of the business; and (3) Wasserman would be on the board of directors of the corporation and serve as general manager.

During late 1971 and January 1972, negotiations between the Rosengardens and Oliver Schmidt, the owner of Autohaus, occurred. In January 1972, in anticipation of the acquisition of Autohaus, but prior to the execution of a purchase contract, the Rosengardens began operating and managing Autohaus. The written agreement for the acquisition of Autohaus was executed on January 31, 1972. Autohaus was capitalized at $76,000, with 760 shares of stock at $100 par value issued and outstanding. Joseph and Ralph purchased the 760 shares.

Wasserman gave notice to Hudek Oldsmobile that he would be terminating his employment as of March 1, 1972, and immediately assumed responsibility for the day-to-day operation of Autohaus. Wasserman worked for approximately three weeks without receiving salary or compensation pending consummation of the acquisition.

Wasserman testified that as of March 1972, there was no discussion with Joseph of restrictions on his shares of stock. In April 1972, after the acquisition of Autohaus, Joseph and Wasserman discussed a shareholders' agreement and Wasserman stated that he would not agree to a repurchase of his shares at a price equal to his original investment. According to Wasserman, the meeting concluded without Wasserman and Joseph in agreement as to the terms of a "buy-sell" agreement because he did not bargain for the guaranteed repayment of his $20,000 investment. Joseph testified, however, that in return for a guaranteed return of Wasserman's $20,000 his shares were to be restricted stock. According to the defendants, the $20,000 initially was a form of security or earnest money for the faithful performance of Wasserman's duties and subsequently became a loan to the corporation. The loan was converted to the purchase price of a restricted, nonappreciating 20% sharehold interest in Autohaus.

On May 1, 1972, Joseph requested that Wasserman tender the purchase price for his 20% stock interest in Autohaus. According to Wasserman on May 2, 1972, he delivered to Joseph a personal check for $20,000 payable to Autohaus and Joseph accepted the check without voicing objections or conditions. The legend on the check stated that it was for the purchase price for 20% of Autohaus' shares of stock. The check was immediately deposited into an Autohaus bank account.

On or about May 9, 1972, Autohaus' attorney tendered to Wasserman a proposed agreement (May agreement) setting forth terms and conditions on Wasserman's 20% stock interest. The agreement was prepared based upon information provided by Joseph, and Autohaus' attorney did not consult with Wasserman prior to drafting the agreement. The May agreement provided that (1) Wasserman would purchase a 20% stock interest (190 shares) in Autohaus at the cost of $20,000; (2) Wasserman would be a member of the board of directors and vice-president of Autohaus; (3) all compensation withdrawn from the business would be equally distributed (one-third each) to Wasserman, Joseph and Ralph; and (4) upon the sale of Wasserman's stock, his death or termination of employment Wasserman's shares would be acquired by Autohaus for $20,000. According to Wasserman, because the May agreement's "buy-sell" provisions were not included in the parties' prior oral agreement, he informed the attorney that he would not sign the agreement. Defendants acknowledge in their brief Wasserman's deposition testimony wherein he stated that he wanted a provision in the agreement that "if I ever left the company I would receive my fair share of the corporate value."

On May 9, 1972, Autohaus' attorney prepared and Joseph executed Autohaus stock certificate No. 8 evidencing the issuance of 190 shares of Autohaus common stock to Wasserman. According to Wasserman, at the time of execution, the stock certificate did not contain a restrictive legend. On May 15, 1972, after Wasserman refused to sign the agreement, Joseph executed and counsel for Autohaus filed with the Illinois Secretary of State a report of issuance of shares indicating receipt of $20,000 from Wasserman, an increase in Autohaus' capital and paid-in surplus from $76,000 to $96,000 and the issuance of 190 shares of Autohaus common stock.

In November 1972, Autohaus' attorney drafted and tendered to Wasserman a second agreement, which stated that an agreement was made and entered into as of May 1, 1972. This November 1972 agreement did not provide for Wasserman's election to the board of directors, for his vice-presidency or for his right to receive one-third of all

distributions of compensation. The formula for determining the purchase price for Wasserman's shares was modified from the fixed price of $20,000 to a price calculated upon the book value of the corporation. In addition, the agreement granted Autohaus the "option" to purchase Wasserman's shares if he desired to sell or in the event of his death or termination. According to Wasserman, he again refused to sign the agreement because it was not in accordance with the oral agreement reached prior to March 1, 1972. According to Autohaus' counsel, Joseph had informed him that the differences had been resolved and that Wasserman would receive the "security" he sought given the 20% book value redemption provision.

Nothing further occurred with respect to the agreement until November 1976. During this period, the Autohaus business prospered, Wasserman managed the day-to-day business affairs of Autohaus as general manager and received an equal distribution of salary and bonuses with the Rosengardens. The notes payable by Autohaus to Schmidt and Northbrook Enterprises were paid out of the income and cash flow of Autohaus thereby decreasing cash availability for distributions of salary or other forms of compensation to Wasserman and the Rosengardens. In November 1976, Wasserman questioned Joseph about year-end bonuses and Joseph proposed that Wasserman sell his Autohaus stock to the corporation at a price equal to its original cost plus accrued interest for five years. Wasserman rejected this offer and a year-end bonus was paid.

Shortly thereafter, in November 1976, Autohaus' attorney tendered another agreement to Wasserman (the November 1976 agreement). This agreement was identical to the November 1972 agreement and Wasserman refused to sign it. Joseph testified that he directed counsel to "send the agreement again after giving some thought with Ralph that that was the deal that was going to be [sic]. There was no more anteing up. There was no more changing agreements."

In late 1976, the relationship between Wasserman and Joseph began to deteriorate, and in early March 1977, Joseph became angry when Wasserman unilaterally extended his vacation an additional three days. Wasserman did not like Joseph's reaction and informed Joseph that if he did not want his presence, Joseph could purchase his stock and he would leave. Thereafter, Joseph announced during a staff meeting that Wasserman would be leaving the company and offered to purchase his shares for $40,000. Wasserman felt the offer was inadequate and rejected it. Joseph removed Wasserman from the Autohaus payroll, from all corporate checking accounts and eventually

physically excluded him from the premises by changing the locks, such that as of March 1977, Wasserman no longer functioned as general manager and vice-president.

According to Wasserman, between May 1972 and March 1977, neither of the Rosengardens notified him that he was not a shareholder of Autohaus or that he had failed to satisfy any conditions with respect to his purchase of the shares. His investment in the 20% stock interest was not returned. Beginning in March 1977, the Rosengardens operated Autohaus as their solely owned business to the total exclusion of Wasserman.

Defendants stated as an affirmative defense that Wasserman never became a shareholder of Autohaus because he failed to accept previously agreed conditions and restrictions on the stock ownership. The trial court found that the limitation on Wasserman's ownership constituted a condition precedent of the shareholders agreement. The court stated the following:

> "To prevail, plaintiff has to prove that he was entitled to an absolute 20% ownership in the corporation when, from the beginning, in every recorded negotiation between the parties, a condition precedent of a shareholders agreement has been suggested and insisted upon. There has been no showing by the plaintiff that this condition was not imposed upon him in every instance in which counsel for the Defendants dealt with him regarding his contemplated stock purchase."

Wasserman argues that this statement demonstrates that the trial court improperly imposed upon him the burden of proving the absence of the condition precedent. We interpret the court's ruling to be that Wasserman did not disprove defendants' evidence that the condition precedent was imposed upon Wasserman in every instance that counsel for defendants met with him. Or stated differently, defendants proved the condition precedent. While we agree with the trial court's findings of fact that defendants' counsel presented the alleged condition precedent to Wasserman in various proposed agreements, we disagree with the court's conclusion that a condition precedent existed.

■■ ■ Under Illinois law, one who asserts an affirmative defense has the burden of proving it. (*Capitol Plumbing & Heating Supply, Inc. v. Van's Plumbing & Heating* (1978), 58 Ill. App. 3d 173, 175, 373 N.E.2d 1089, 1091.) A condition precedent is a condition which must be performed before there is a formation of a contract binding on the parties. (*Wysocki v. Bedrosian* (1984), 124 Ill. App. 3d 158, 163, 463 N.E.2d 1339, 1344.) Where a party claims that his own language creates a condition precedent to his performance, it must be es-

tablished clearly that the parties intended to create a condition at the time of contracting. *South Division Credit Union v. Deluxe Motors, Inc.* (1976), 42 Ill. App. 3d 219, 222, 355 N.E.2d 715, 718-19; *F.E. Holmes & Son Construction Co. v. Gualdoni Electric Service, Inc.* (1982), 105 Ill. App. 3d 1135, 1139, 435 N.E.2d 724, 726.

■ We find as a matter of law that the evidence does not clearly establish that the parties intended to create a condition precedent at the time of contracting. Rather, the evidence indicates that Wasserman's shareholder status was contingent upon the payment of $20,000, such that upon defendants' acceptance of the $20,000, the defendants had the duty to accord Wasserman his rights and privileges as a shareholder.

■ "A condition precedent is an act or event, other than a lapse of time, which must exist or occur before a duty of immediate performance of a promise arises." (J. Calamari & J. Perillo, The Law of Contracts ch. 11, §11—3, at 384 (2d ed. 1977).) If the sale of the stock was subject to a condition precedent that a written agreement be executed restricting the shares' transferability, the agreement should have been prepared and signed before payment was unconditionally accepted. Wasserman and the Rosengardens testified that Wasserman's status as a stockholder was to be the subject of a written agreement. Wasserman did not, however, characterize the written agreement as a condition precedent. Wasserman stated that when he arrived at Autohaus on March 1, 1972, there was a full and complete understanding between the parties as to the terms of the oral shareholder's agreement.

Defendants contend that the initial agreement reached in early 1972 was an employment contract wherein Wasserman would work for Autohaus as its general manager and share equally with Joseph and Ralph in all compensations, profits and bonuses. Defendants argue that there would be a contradiction for a 20% shareholder to receive 33⅓% of the dividends but not the losses of the corporation. In heir brief, defendants concede that in March and April 1972, the partis agreed orally that Wasserman could purchase stock in the corporation and that the sum of $20,000 for a 20% interest was proposed by Wasserman and agreed to by Joseph. Defendants further concede that in April 1972, they voted to issue to Wasserman 190 shares of Autohaus stock conditioned upon his agreeing to the restriction of his right to dispose of the stock. Likewise, Wasserman acknowledges that he knew based upon his conversation with Joseph in April 1972, that a restriction would be placed upon the disposition of his shares.

On May 2, 1972, Wasserman tendered a $20,000 check which

stated on its face that it was payment for 20% of the stock of Autohaus. This check was immediately deposited into an Autohaus bank account. On May 15, 1972, Joseph signed a report of issuance of shares and increases in stated capital and paid-in surplus which was filed by Autohaus' counsel with the Secretary of State on May 16, 1972. The capitalization of Autohaus as reported in the report of issuance was that the shares issued increased from 760 to 950, the stated capital increased from $76,000 to $95,000 and the paid-in surplus increased from zero to $1,000. Counsel for Autohaus testified that the $20,000 referred to in the report of issuance was the $20,000 received from Wasserman on May 2, 1972, and that 190 shares were issued to Wasserman on May 9, 1972, in consideration for his $20,000 payment. The report of issuance was filed approximately one week after Autohaus' counsel had tendered the May agreement to Wasserman and he had refused to sign it. As stated by Autohaus' counsel, the report of issuance was filed because the 190 shares of Autohaus stock were issued and outstanding in Wasserman's name as of May 9, 1972, and Joseph had informed him that Wasserman had paid the $20,000. The certificate for the 190 shares was not delivered to Wasserman because he failed to sign an agreement. Under these circumstances, we do not find clear evidence of a condition precedent to Wasserman's status as shareholder.

In accordance with the Business Corporation Act Autohaus filed annual reports with the Illinois Secretary of State. The 1973 annual report, the first annual report filed after Wasserman's stock purchase, and every annual report filed through the year ending December 31, 1986, Autohaus reported the 950 shares as issued and outstanding. Defendants assert that the 190 shares issued to Wasserman on May 9, 1972, were "redistributed" in 1985. Fifty percent of the shares were reissued to Joseph and his son, and the remaining 50% were issued to Ralph after the Rosengardens concluded that Wasserman would never complete the agreement with Autohaus and that there was no longer going to be a "deal."

Stuart Boykoff, defendants' outside auditor, testified that in October 1972, the $20,000 payment made by Wasserman in May 1972 was classified as capital stock in the Autohaus general ledger and that at the time of trial Wasserman's $20,000 investment remained on Autohaus' books and records as part of the capital stock. Moreover, Boykoff testified that the entries indicated that Wasserman was the owner of the shares. Boykoff conceded that a ledger entry describing Wasserman's entry as a loan could have been an error.

In October 1972, approximately five months after Wasserman

refused to sign the May agreement, Autohaus classified the $20,000 payment as $19,000 for capital stock and $1,000 paid-in surplus pursuant to Joseph Rosengarden's direction.

Autohaus' Federal income tax returns for the fiscal years 1978-81 indicate that the Rosengardens owned 760 shares or 80% of Autohaus' outstanding stock. The balance sheets reported that Autohaus had $95,000 in common stock and $1,000 in paid-in surplus. Financial statements prepared by Autohaus' outside auditors for the years 1972 through 1983 reveal that Autohaus had 950 shares of stock issued and outstanding and a total capital of $96,000 ($95,000 in common stock and $1,000 in paid-in capital). These figures are consistent with Wasserman's ownership of the 190 shares issued in May 1972.

The 1972 financial statement prepared in February 1973, nine months after Wasserman refused to sign the May agreement, and three months after he refused to sign the November 1972 agreement, reflect that Autohaus received $20,000 in additional working capital through the "Sale of Common Stock." In March 1977, defendants offered to purchase Wasserman's shares for $40,000, which according to Joseph was 20% of the current book value of Autohaus.

■ Therefore, the conduct of the parties evidences an attempt to negotiate the terms of a "buy-sell" agreement rather than the existence of a condition precedent. Accordingly, the trial court's findings that Wasserman did not become and is not a shareholder in the Autohaus corporation are against the manifest weight of the evidence. *Laroia v. Reuben* (1985), 137 Ill. App. 3d 942, 485 N.E.2d 496.

■■ Alternatively, Wasserman argues that the judgment cannot stand because defendants were precluded by the doctrines of waiver and estoppel from asserting the purported unsatisfied condition precedent as a bar to plaintiff's stock ownership. The waiver of terms and conditions of a contract may be established or inferred from acts or conduct by the waiving party evidencing his intention to relinquish his known rights. (*Beverly Bank v. Alsip Bank* (1982), 106 Ill. App. 3d 1012, 1017, 436 N.E.2d 598, 602-03.) Even if the evidence established a shareholder agreement as a condition precedent, defendants waived any condition precedent to the sale of the shares to Wasserman when they accepted his payment, issued the shares, retained his payment and reported the stock issuance.

■■ Wasserman further asserts that he quit his job, obtained a second mortgage on his home in order to invest $20,000 in Autohaus, and worked for five years on behalf of Autohaus at a reduced compensation level in reliance on his shareholder status. A party that accepts the benefits of an agreement is estopped from denying the ex-

istence of that agreement or from performing its obligations thereunder. (*Cashman v. Shinn* (1982), 109 Ill. App. 3d 1112, 1117, 441 N.E.2d 940, 943; *Artnell Co. v. National Broadcasting Co.* (1972), 4 Ill. App. 3d 970, 974, 282 N.E.2d 493, 495.) Defendants actively solicited Wasserman's participation in the Autohaus venture based upon his experience and expertise as a retail automobile dealership manager and received the benefits of his five years of management during which time the business became increasingly profitable. In addition, defendants sought and received Wasserman's financial participation.

Wasserman argues that he contributed his fair share of the capital needed to operate the business. The Rosengardens' total cash investment to Autohaus was a $54,000 loan, which was paid to Northbrook upon the closing of the acquisition to reduce Northbrooks' $75,000 note to $21,000. The Rosengardens' loan to Autohaus was reduced from $54,000 to $32,000 prior to December 31, 1972, reducing their investment in Autohaus by $22,000. Wasserman's $20,000 investment represented 38% of the actual cash advanced by the shareholders to provide working capital for Autohaus (after reduction of the Rosengardens' loan from $54,000 to $32,000). The Rosengardens' $32,000 loan to Autohaus was repaid with interest.

Autohaus secured other working capital needed to operate from loans guaranteed by the Rosengardens. Autohaus' profits and cash were used to pay all of Autohaus' obligations. While the Rosengardens assumed more financial risks than Wasserman did, Wasserman was responsible for the full time operation of the business. As of December 31, 1986, Autohaus' indebtedness of $147,000 and $75,000 had declined to $56,000 and $4,575, respectively. From 1972 to year end 1976, Autohaus' net worth increased from zero to $200,000. Thus, the Rosengardens and Autohaus received the benefit of their agreement with Wasserman and are estopped from asserting an alleged condition precedent as a bar to their obligations under the oral stock purchase agreement.

■ A person who presents the performance of an alleged condition to a contract cannot take advantage of his conduct to claim that the resulting failure of the condition relieves him of his obligation under the contract. (*Grill v. Adams* (1984), 123 Ill. App. 3d 913, 918, 463 N.E.2d 896, 900.) Since defendants failed to draft an agreement conforming to the parties' oral understanding, and notwithstanding the absence of a written agreement, accepted Wasserman's payment for the shares and retained it for their benefit without attempting to rescind or nullify the sale, they are estopped, five years thereafter, from asserting a condition as a bar or defense to their performance.

240

*Barrows v. Maco, Inc.* (1981), 94 Ill. App. 3d 959, 966, 419 N.E.2d 634, 639.

Accordingly, we reverse the judgments of the trial court, hold that Wasserman was and is a stockholder of Autohaus and remand this cause for proceedings consistent with this opinion.

Reversed and remanded.

McNAMARA* and WHITE, JJ., concur.

---

*Justice McNamara participated in this opinion prior to his assignment to the sixth division.